

# THE ATTORNEY GENERAL
## OF TEXAS

April 15, 1988

JIM MATTOX
ATTORNEY GENERAL

Mr. Edwin J. Smith, Jr.          Opinion No. JM-895
Chairman
State Board of Insurance         Re: Requirements of House Bill
1110 San Jacinto Blvd.           No. 677 of the 70th Legisla-
Austin, Texas    78701           ture, the Texas Continuing
                                 Care Facility Disclosure and
                                 Rehabilitation Act (RQ-1227)

Dear Mr. Smith:

　　　You ask several questions concerning the Texas
Continuing Care Facility Disclosure and Rehabilitation
Act, which was adopted by House Bill No. 677 of the 70th
Legislature and codified as article 8876, V.T.C.S. It
applies to contracts for continuing care entered into on
or after September 1, 1987. V.T.C.S. art. 8876, §23. The
statute authorizes the State Board of Insurance to
regulate continuing care providers. V.T.C.S. art. 8876,
§3. A continuing care retirement community provides
housing, board, care, and health related services to
elderly people who do not want to maintain their own homes
but do not need nursing home care. Texas House of
Representatives, Committee on Human Services, _Interim
Report to the 70th Texas Legislature_, "Continuing Care
Communities," 119, 124. It generally consists of
residential facilities and a health care center and
requires a substantial entrance fee in addition to other
monthly fees in return for an assurance of a continuing
living arrangement throughout retirement. House Human
Services Committee, Bill Analysis, H.B. No. 677, 70th Leg.
(1987). Because of the considerable investment which
continuing care centers require from the elderly, House
Bill No. 677 was written to protect the consumer from loss
of his investment through fraud or mismanagement. _Id._

　　　The statute defines "continuing care" as follows:

　　　　　[T]he furnishing, to an individual who is not
　　　　　related by consanguinity or affinity to the
　　　　　person furnishing the care, of board and
　　　　　lodging, together with personal care
　　　　　services, and nursing services, medical

> services, or other health-related services, regardless of whether or not the services and the lodging are provided at the same location, under an agreement that requires the payment of an entrance fee and that is effective either for the life of the individual or for a period of more than one year.

V.T.C.S. art. 8876, §2(2). The article authorizes the State Board of Insurance to regulate continuing care providers and to adopt rules and take other action necessary to administer and enforce the act. V.T.C.S. art. 8876, §3. Continuing care providers are required to receive a certificate of authority from the board. V.T.C.S. art. 8876, §4. Providers must deliver a disclosure statement to prospective residents before entering into a contract to provide continuing care and must also establish an entrance fee escrow account. Id. §8. The commissioner of insurance may place a provider under supervision if it is bankrupt or otherwise is financially unable to meet its obligations for continuing care. Id. §11. There are provisions for rehabilitation or liquidation. Section 13 gives to

> [e]ach resident receiving care in a portion of a facility licensed to provide nursing home care, personal care, or custodial care . . . all statutory rights provided to nursing home, personal care, or custodial care residents.

The substantive requirements may be enforced by civil and criminal penalties and by equitable proceedings. Id. §§15-18.

You first ask about the applicability of the certificate of authority requirement. This provision states as follows:

> Sec. 4. (a) After September 1, 1987, no provider shall offer to the public a contract for continuing care, or construct or acquire a facility for the purpose of providing continuing care, without obtaining a certificate of authority from the board.
>
> (b) The commissioner shall promulgate rules and regulations setting forth the information to be submitted by an applicant for a certificate of authority.

(c)   The commissioner, upon receipt of an application for a certificate of authority, shall conduct a hearing on the application in accordance with the Administrative Procedure and Texas Register Act (Article 6252-13a, Vernon's Texas Civil Statutes). The commissioner shall grant the application if he finds that the applicant or the facility is financially sound; that the competence, experience, and integrity of the applicant, its board of directors, its officers or its management is such that it would be in the interest of the public to issue a certificate of authority; and that the applicant is capable of complying with the provisions of this Act.   The commissioner may limit issuance of certificates of authority to incorporated entities.   The commissioner shall issue an order approving or disapproving the application within 180 days of filing.

(d)   No certificate of authority issued by the commissioner shall be transferred to a third party except upon approval by the commissioner.

.(e)   No holder of a certificate of authority shall enter into a contract with a third party for management of the facility unless the commissioner is notified of such contract.

(f)   If a provider: (1) draws upon its entrance fee escrow in an amount greater than provided for in Section 8 of this Act; (2) draws upon its reserve fund escrow in an amount greater than provided for in Section 9 of this Act; or (3) engages in a wilful and intentional violation of this Act, the commissioner, after notice and hearing, may suspend or revoke the provider's certificate of authority, in addition to any other remedies provided for in this Act.

(g)   The commissioner shall issue a certificate of authority to any facility which is occupied by one or more residents on September 1, 1987, which is under construction on September 1, 1987, or which,

prior to September 1, 1987, had incurred substantial financial obligations related to the development of a facility. Such certificates shall be subject to revocation or suspension as provided for in this section.

V.T.C.S. art. 8876.

Section 4(a) of article 8876, V.T.C.S., requires a provider to obtain a certificate of authority if he offers a contract for continuing care or constructs or acquires a facility for that purpose after September 1, 1987. Section 4(c) establishes procedures and substantive requirements governing issuance of certificates of authority by the insurance commissioner. Section 4(g), however, states that "the commissioner shall issue a certificate of authority" (emphasis added) to any facility which is occupied, under construction, or is the subject of substantial financial obligations by September 1, 1987.

You ask whether a facility described in section 4(g) is required to meet the criteria of section 4(c) or whether instead the commissioner must issue a certificate of authority to such a facility without considering those criteria.

Section 4(g) provides an exception from the criteria in section 4(c) for the three categories of continuing care facilities it describes. In each category there has been considerable investment in a facility prior to the effective date of article 8876. V.T.C.S. art. 8876, §23. As shown by the use of the mandatory "shall" in section 4(g), these facilities are entitled to receive a certificate of authority from the commissioner without meeting the substantive requirements set out in section 4(c).

Your next question involves the relationship between section 4(g) of article 8876, V.T.C.S., and section 20, the transition provision. Section 20 provides as follows:

Sec. 20. (a) A provider who operates a continuing care facility that is in existence on the effective date of this Act must comply with the disclosure and escrow requirements imposed under this Act as provided by this section.

(b) A provider subject to Subsection (a) of this section must file annual revised

disclosure statements with the board as provided by Section 7 of this Act beginning with a statement that covers the provider's most recent fiscal year that begins on or after September 1, 1987.

(c) A provider subject to Subsection (a) of this section must comply with the escrow requirements imposed under Sections 8 and 9 of this Act not later than September 1, 1990. If the commissioner determines that a provider subject to Subsection (a) of this section is unable to comply with this section after making a good faith effort to do so, the commissioner may extend the time for compliance for a reasonable period of time.

(d) Failure to comply with the requirements of this section constitutes a criminal offense under Section 18 of this Act.

You ask whether the entire act as well as the rules adopted by the State Board of Insurance apply to facilities described by section 4(g), or only those delayed requirements listed in section 20.

Section 20 applies to continuing care facilities that are in existence and are being operated on September 1, 1987, the effective date of the act. House Bill No. 677 as introduced did not include the requirement that continuing care facilities obtain a certificate of authority from the State Board of Insurance. Bill Analysis, H.B. No. 677, supra. Thus, the bill as introduced did not include any provision like subsection 4(g) that allowed certain facilities to receive a certificate of authority without making the showing required by section 4(c). The provision enacted as section 20 of article 8876, V.T.C.S., provided the only exception in the original bill from compliance with the act's requirements on its effective date. Section 4 was added as part of the Committee Substitute to House Bill No. 677, supra. Section 4(g) excepts the facilities it describes only from the substantive requirements of section 4(c); it does not authorize those facilities to meet the statutory requirements on the delayed basis outlined in section 20.

Section 4(g) expressly states that certificates of authority given under its provisions "shall be subject to revocation or suspension as provided for in this section."

V.T.C.S. art. 8876, §4(g). Subsection 4(f) provides for suspension or revocation of a certificate of authority as follows:

> (f) If a provider: (1) draws upon its entrance fee escrow in an amount greater than provided for in Section 8 of this Act; (2) draws upon its reserve fund escrow in an amount greater than provided for in Section 9 of this Act; or (3) <u>engages in a wilful and intentional violation of this Act</u>, the commissioner, after notice and hearing, may suspend or revoke the provider's certificate of authority, in addition to any other remedies provided for in this Act. (Emphasis added.)

V.T.C.S. art. 8876, §4(f). This provision makes clear the legislature's intent that subsection 4(g) not exempt facilities from provisions of the act other than that describing the criteria for a certificate of authority.

You have not submitted any rules to us, and we can consider the application of rules to section 4(g) facilities only in general terms. Ordinarily, your rules applicable to other continuing care facilities would also apply to section 4(g) facilities, except for rules implementing section 4(c).

Your third question recognizes that some facilities will be covered by both the exception in section 4(g) and the exception in section 20. If a facility is occupied by one or more residents on September 1, 1987, it will be "in existence on the effective date" of the act and thus will be entitled to a certificate of authority under section 4(g) and will also have the benefit of the transition provision: section 20. You ask whether a facility described in section 20 includes only a facility occupied by one or more residents on September 1, 1987, or also includes a facility which is under construction on September 1, 1987 and one which, prior to September 1, 1987, had incurred substantial financial obligations related to the development of the facility.

Section 20(a) applies to "[a] provider who operates a continuing care facility that is in existence on the effective date of this Act. . . ." A "continuing care facility" is "a place in which a person undertakes to provide continuing care to an individual." V.T.C.S. art. 8876, §§2(2), (4). "Operate" is defined as "to perform a

function." Webster's Ninth New Collegiate Dictionary. Section 20(a) applies to a facility where a person is already providing continuing care as of September 1, 1987. If the facility is merely under construction, or if the provider has done no more than incur substantial financial obligations toward construction of a facility, the facility cannot be used to provide continuing care and is not even in existence. Section 20(a) does not apply to the latter two categories of "facility."

You next ask whether the commissioner, in implementing section 4(g), has discretion to determine whether the financial obligations related to the development of a facility incurred prior to September 1, 1987, are "substantial." V.T.C.S. art. 8876, §4(g). Whether financial obligations incurred are "substantial" is a fact question, which must be answered in relevant cases before a certificate can be issued. Section 4(b) of article 8876, V.T.C.S., authorizes the commissioner to "promulgate rules and regulations setting forth the information to be submitted by an applicant for a certificate of authority." He is to conduct a hearing on the applications submitted. V.T.C.S. art. 8876. The commissioner has access to the information and the procedural framework for deciding whether an applicant for a certificate of authority has incurred substantial financial obligations toward the development of a facility. This determination is not a matter for the commissioner's unfettered discretion but must be made in accordance with the Administrative Procedure and Texas Register Act, article 6252-13a, V.T.C.S. V.T.C.S. art. 8876, §4(c); see also V.T.C.S. art. 6252-13a, §§3(2), (13).

You finally ask several questions about the definitions of "entrance fee" and "continuing care" in the statute. Section 2 provides as follows:

> (2) 'Continuing care' means the furnishing, to an individual who is not related by consanguinity or affinity to the person furnishing the care, of board and lodging, together with personal care services, and nursing services, medical services, or other health-related services, regardless of whether or not the services and the lodging are provided at the same location, <u>under an agreement that requires the payment of an entrance fee and that is effective either for the life of the individual or for a period of more than one year</u>.

(3) 'Entrance fee' means an initial or deferred transfer of money, or other property valued at an amount in excess of three months' rent, made, or promised to be made as full or partial consideration for acceptance by a provider of a specified individual as a resident in a facility. (Emphasis added.)

V.T.C.S. art. 8876, §2.

You ask:

Does the use of an agreement that is of less than one years' duration, including a month-to-month contract, but which is guaranteed renewable by the resident, subject a facility to regulation under the act?

Any renewal provision must be evaluated according to its language and its function in the context of the whole contract. For example, a renewal provision which provides for automatic renewal every month in the absence of notice by the resident or one which provides for renewal on the receipt of each rent check could in effect be a contract for the life of the resident. The significance of such provisions should be determined on a case by case basis by the commissioner or the board in the exercise of their enforcement powers under the statute. See V.T.C.S. art. 8876, §§16, 17.

You next ask:

Does the charging of an upfront fee greater than the amount of three months' rent, but which is called an 'initial fee,' 'deposit,' or 'application fee' and is fully or partially refundable, subject a facility to regulation under the act?

If the fee fits the definition found in section 2(3), it is an entrance fee, even though the provider calls it something else. The fact that a fee is refundable does not remove it from the definition of "entrance fee." Article 8876, V.T.C.S., contemplates that some providers might charge an entrance fee that is fully or partly refundable. Section 6(g)(4) requires that a disclosure statement set out

the conditions, if any, under which all or part of the entrance fee is refundable on cancellation of the contract by the provider or by the resident, or in the event of the death of the resident. . . .

V.T.C.S. art. 8876, §6(g)(4).

You next ask:

Does the charging of an entrance fee less than the amount of three months' rent with an additional lump sum fee payable annually, the aggregate of which would be greater than three months' rent, subject a facility to regulation under the act?

An entrance fee includes an "initial or deferred transfer" of money or other property as consideration for acceptance of a specified individual as a resident in a facility. If the additional lump sum fee is part of the consideration for accepting the individual as a resident, it is an "entrance fee" even though its payment is deferred.

You next ask:

Does the act impose any duty on the State Board of Insurance or the commissioner to review a facility's arrangements for the purpose of determining applicability of the act to that facility?

We understand your question to relate to financial and contractual arrangements of continuing care providers, and not to the physical premises of continuing care facilities. The statute imposes the following duty on the State Board of Insurance:

Sec. 3. The State Board of Insurance shall regulate continuing care providers as provided by this Act. The board may adopt rules and take other action as necessary to administer and enforce this Act. (Emphasis added.)

V.T.C.S. art. 8876, §3. The board has a mandatory duty to enforce this statute to protect consumers from the loss of investment that might occur through fraud or mismanage-ment. We cannot tell you, as a matter of law, how to

exercise your powers and carry out your duties under article 8876, V.T.C.S. That is a matter for the board's discretion. We note, however, that the board has been given power to make rules and regulations, as well as considerable authority to require the submission of information necessary to carry out its responsibilities. See, e.g., V.T.C.S. art. 8876, §4(c) (information to be submitted by an applicant for a certificate of authority); §§5-7 (recording requirements); §16 (conduct of investigations, subpoena power). See also V.T.C.S. art. 8876, §§11, 17 (power to act on investigation prompted by complaint).

We also point out that some provisions state how particular powers shall be exercised. For example, the commissioner shall conduct a hearing on an application for a certificate of authority in accordance with the Administrative Procedure and Texas Register Act, and shall grant the certificate on certain fact findings. V.T.C.S. art. 8876, §4(c). In addition, with respect to the requirement that providers file a disclosure statement and revised disclosure statements with the State Board of Insurance,

> [t]he commissioner shall review the disclosure statement for completeness but shall not be required to review the disclosure statement for accuracy.

V.T.C.S. art. 8876, §7(c).

Your last question is as follows:

> The definitions of 'continuing care' and 'entrance fee' state five elements that describe the type of facilities to be regulated under the Act. These five elements are as follows:
>
> (1) furnishing board;
>
> (2) furnishing lodging;
>
> (3) furnishing personal care services, and either nursing services, medical services, or other health-related services;
>
> (4) an agreement that is effective either for the life of an individual or for a period of more than one year; and

> (5) requirements of an entrance fee (money or property of value in excess of three months' rent) in the agreement.

> Must a facility meet all five requirements in order to be subject to this act?

Your question essentially tracks the definitions of "continuing care" and "entrance fee" that are set out in the statute.  See V.T.C.S. art. 8876, §2(2), (3).  We therefore answer your question in the affirmative:  the five elements you set out must be present for a facility to be a continuing care facility subject to regulation under the statute.  Whether those five elements are present in a given facility must be decided in the context of all relevant facts and circumstances.  Of course, it is the substance of the agreement, not the form, that is determined, and subterfuges will not avoid the statute.

## S U M M A R Y

> A continuing care facility described in section 4(g) of article 8876, V.T.C.S., is entitled to receive a certificate of authority without meeting the criteria found in section 4(c) of that statute. Except for the section 4(c) criteria, the entire statute becomes applicable on its effective date to section 4(g) facilities.  If a facility is merely under construction on September 1, 1987, or if the provider has done no more than incur substantial financial obligations toward construction of a facility, the transition provision found in section 20 is not applicable to it.  The commissioner has authority to make the fact findings necessary to implement section 4(g) of article 8876, V.T.C.S.

Very truly yours

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Susan L. Garrison
Assistant Attorney General